**MARYLAND SHIPBUILDING & DRY-DOCK COMPANY and Coastal, Ship Corporation and Sea-Land Service, Inc.**

v.

**The BAKER–WHITELY TOWING CO. and TUG AMERICA, TUG PROGRESS and TUG SCANDANAVIA, their respective engines, boilers, etc.**

No. 4982.

United States District Court
D. Maryland.

June 23, 1967.

See also D.C., 42 F.R.D. 12.

David R. Owen, William R. Dorsey, III, Semmes, Bowen & Semmes, Baltimore, Md., and Foley & Martin, New York City, for libellants.

John D. Alexander, John D. Alexander, Jr., Constable, Alexander & Daneker, Baltimore, Md., for respondent.

NORTHROP, District Judge.

On December 19, 1963, at about 7:30 a. m., the SS FAIRLAND, a dead ship, while being undocked from Drydock 3 of the Maryland Shipbuilding & Drydock Company collided with a dolphin. This suit is to determine liability only. The libellants are Maryland Shipbuilding & Drydock Company (Maryland) and Coastal Ship Corporation (Coastal) and Sea-Land Service, Inc. (Sea-Land). Mary-

land claims damages to the dolphin; Coastal claims damages to the SS FAIRLAND's propeller; Sea-Land claims detention damages on her charter. The respondents are The Baker-Whitely Towing Co. (Baker-Whitely) and Tugs AMERICA, PROGRESS, and SCANDINAVIA, their respective engines, boilers, etc.

Libellants are seeking to recover in tort and on implied warranty. Respondents contend implied warranty is not applicable and that the proximate cause of the accident was the negligence of Maryland because of its failure to exercise proper control over the vessel, because in the undocking of the SS FAIRLAND too few lines and linemen were used, or because the line that parted was defective.

The point at issue is who had control of the FAIRLAND when she struck the upriver dolphin off of Pier 4.

The SS FAIRLAND had been converted into a container ship. Therefore, she had a molded beam (over sponsons) of 72'. Her former beam was 63'. On these sponsons were cranes used to unload containers which served as trailer bodies for transport over the highways. Each container was 25' long, 8' wide, and 8'6" high. The FAIRLAND at the time of this occurrence had a full complement of 226 containers which were empty. There were 60 containers on deck on top of the hold covers; 36 were stacked 2 deep across the width of the hold covers aft the bridge.

The ship's draft upon leaving the drydock was forward 16'6" and aft 17'3". Her overall length was 468'8½"; depth to shelter deck was 40'1⅞".

It is not necessary at this point to relate any more details because it is admitted by all witnesses that the FAIRLAND was light in the water and presented considerable surface to the W/NW wind blowing at the time of the occurrence. The weather reports indicated the wind velocity that day at the time in question to be 15 miles per hour and gusty. Other testimony was that it was anywhere between 10 and 25 knots, but all witnesses did not consider it of sufficient velocity to prevent the undocking.

All the witnesses recognized the existence of these conditions at the time.

The characteristics of the tugs follow:

|  | AMERICAN | PROGRESS | SCANDINAVIA |
|---|---|---|---|
| Length | 96.9' | 86' | 86' 6⅞" |
| Beam | 27' | 24'1" | 24' |
| Draft | 12'1" | 10'6" | 9'6" |
| Horsepower | 1200 | 700 | 700 |
| Age of Tug | 1945 | 1944 | 1943 |

All witnesses admit that all tugs had ample power to handle the SS FAIRLAND under the existing circumstances.

Maryland's #3 drydock had a draft of 22' when the FAIRLAND left it. The width was 93'.

Downriver and immediately adjacent to Drydock 3 was Pier 4 with a tee as a buffer extending therefrom. At each end of the tee was a dolphin. The upriver dolphin, the one closest to Drydock 3, was the one which the FAIRLAND's propeller struck as her stern fell downstream. That dolphin was 77' from the end of the downriver wingwall of Drydock 3. Still downriver and adjacent to Pier 4 was Drydock 4. Off that drydock and outriver from its wingwalls were two pile clusters. The upriver cluster was approximately 127' from the end of the downriver wingwall of Drydock 3.

Donald Crabill was dockmaster in charge of the linemen for Maryland. The lines were 100' manila rope 6" in circumference. There were 4 lines out,

2 on the bow and 2 on the stern. Eight linemen were present, 2 on each line. This was the normal undocking procedure at Maryland. More lines and linemen were used at Bethlehem's Key Highway dock, the testimony revealed. Further testimony indicates that this was due to a different method of docking employed at that shipyard.

Because of this court's findings as to negligence hereinafter set forth, it is unnecessary to include in detail the stipulation and facts concerning the bits, chocks, roller chocks, and capstans available on Drydock 3 and the FAIRLAND for keeping the ship straight as she came out. Nor is it necessary to make fine mathematical calculations as to the length of the lines at various stages of the undocking.

Baker-Whitely was contacted by telephone the day before. Three tugs were dispatched to the undocking and arrived at around 7:00 a. m. on the morning of December 19. The PROGRESS, the tow tug, put a tow line from her stern to the FAIRLAND's bow. The AMERICA was stationed upriver to the windward of the drydock while the SCANDINAVIA was downriver. Captain Eminizer on the SCANDINAVIA was the undocking captain. He testified that when the signal was given to commence undocking by the dockmaster Crabill, the SCANDINAVIA was lying at an angle bow in off the upriver dolphin on the tee off Pier 4 and the upriver cluster off of Drydock 4. As the undocking progressed, the SCANDINAVIA took a position at right angle to the FAIRLAND just off of the upriver cluster off of Drydock 4. He testified that he was in a proper position to aid the FAIRLAND should she need it and that his tug had adequate power to keep the vessel straight. There she remained backing and filing while the FAIRLAND was coming out under the tow. There is conflict in Captain Eminizer's testimony as to whether the SCANDINAVIA ever pushed against the FAIRLAND until after he had boarded her in the stream. He did say that he saw the FAIRLAND fall down at least

twice while she was in the drydock, but that he saw her checked each time. He knew that the wind was fresh and gusty and that the #3 drydock was exposed to the W/NW wind. He admitted that with the FAIRLAND light in the water and with containers two deep on her stern, the wind would tend to force her stern down. Nevertheless he conceived his responsibility to keep her stern up only to come about when the FAIRLAND had cleared the dolphin off of Pier 4 some 77′ from the downriver wingwall of the drydock.

Captain Eminizer could not see the upriver linemen from his position on the starboard side of the FAIRLAND and by his own admission paid no further attention to dockmaster Crabill. Yet at one point he testified that it would have been his responsibility to keep the FAIRLAND's stern up as soon as the lines were cast off. But he never looked for any such signal from Crabill whom he had seen standing on the river end of Pier 4.

While the FAIRLAND was being towed out at about ½ knot, the SCANDINAVIA was backing and filing at right angles to her just off of the upriver cluster at Drydock 4. During that period dockmaster Crabill found it necessary twice to order the upriver stern linemen to check their lines hard to prevent the FAIRLAND from striking the downriver wingwall. Crabill also testified that he tried to attract the attention of the SCANDINAVIA to push against the FAIRLAND to keep her up, but to no avail.

As the stern of the FAIRLAND was passing over the sill, the port stern line parted.

The FAIRLAND cleared the downriver wingwall and fell upon the upriver dolphin off of Pier 4. Both the testimony of the linemen and even of Captain Petty on the AMERICA support the fact, which this court finds, that at this point the stern of the FAIRLAND was passing over the sill of the drydock. Indeed until she started downriver the captain of the PROGRESS and Captain

Eminizer believed that she was coming out straight. Captain Eminizer proceeded to come alongside of and boarded the FAIRLAND. He did not learn or even think that anything had occurred until he got word from a drydock boat to return the FAIRLAND to Drydock 3.

The libellants contend that the undocking captain's duty to take control of a vessel commences as the end of that vessel passes over the sill. They did produce expert testimony however to the effect that it is a joint responsibility with the docker's duty diminishing and the tug's increasing as the vessel proceeds out of the drydock. All of the libellants' experts including Captain Pledger, whose testimony this court took under reservation but now accepts giving it such weight as it deserves, categorically testified that the tug's responsibility begins as the end of the vessel, in this case, the stern, passes over the sill. Respondents' expert, Captain Phoebus, while first agreeing with Captain Eminizer that the tug's control comes only when the stern clears all obstructions, finally stated and could not be dissuaded that when the lines are let go as the stern passes over the sill, the undocking captain's responsibility commences.

■ Captain Phoebus further states as did the libellants' experts that Captain Eminizer as the undocking captain should have been looking for the signal or at least have seen the stern come out of the drydock and start to fall down. It was at that point that his duty to push abaft of the midship of the FAIRLAND began. He was in a position to do just that, had he kept himself aware of what was transpiring. There are numerous conflicts in his testimony. It can best be summarized by the expression of his belief that everything was going all right ("she was coming out nice"). He, however, neglected his duty to observe and to come up against the FAIRLAND and hold her stern into the wind, although he was aware of the effect that the wind would have on the FAIRLAND's stern as it came out of the drydock.

■■ This court cannot agree with the respondents that the parting of the upriver stern line caused the damage. Nor can this court find that the line was defective, that it parted while the stern of the FAIRLAND was in the drydock, or that the use of only four lines—two on the bow and two on the stern—which has been a longtime custom at Maryland, constituted negligence. Certainly Respondents' own docking pilot in charge, Captain Eminizer, did not consider it as making any difference to him and his ultimate duty to push laterally. Captain Petty of the Tug AMERICA, respondents' own witness, said that although he did not see the line part, he saw the FAIRLAND's stern fall down *when clear of the drydock*. But he did not see it strike the dolphin. Even if the line was defective, the tug's responsibility to keep the stern up had commenced. At this critical moment the SCANDINAVIA was in a position and should have held the FAIRLAND straight.

■ This court does not accept respondents' contention that the sponsons on the FAIRLAND would prevent the SCANDINAVIA from performing her duty to keep the stern up because of Captain Eminizer's answer to the last question on cross-examination. He was asked whether "[i]t would have done good if you pushed on the flat part of the aft of the midship line * * *." His answer was "If I had thought the ship needed it, yes."

■ I conclude that Baker-Whitely is at fault in that Captain Eminizer, its docking pilot, failed in "the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." Stevens v. The White City, 285 U.S. 195, at 202, 52 S.Ct. 347, at 350, 76 L.Ed. 699 (1932).

Having so found, it is unnecessary to consider libellants' other contentions as to implied warranty or whether or not

under the circumstances existing here the docking captain should have had the AMERICA stationed so as to keep the FAIRLAND's stern up by lines as she came out.